**Irving TONER, Plaintiff,**

v.

**Richard S. SCHWEIKER,[1] Secretary of Health and Human Services, Defendant.**

**No. CIV–80–783E.**

United States District Court,
W. D. New York.

April 21, 1982.

---

1. Pursuant to Fed.R.Civ.P. rule 25, Richard S. Schweiker is hereby ORDERED substituted as

defendant in place of Patricia Roberts Harris.

Lawrence C. Franco, Buffalo, N. Y., for plaintiff.

Roger P. Williams, U. S. Atty., Michael A. Brady, Asst. U. S. Atty., Buffalo, N. Y., for defendant.

MEMORANDUM and ORDER

ELFVIN, District Judge.

This is an action to review the Secretary's denial of plaintiff's claims for retirement insurance benefits for 1978 and for Medi-

care Part B coverage prior to July, 1978. Plaintiff's claim for retirement insurance benefits invokes the question whether he earned wages in excess of the amount permitted under section 203 (42 U.S.C. § 403) of the Social Security Act. With respect to plaintiff's claim for Medicare benefits prior to July, 1978, the basic issue involves the date on which plaintiff properly submitted an application therefor. The Secretary has moved for summary judgment and, for the reasons set out below, I have concluded that his motion must be granted.

Section 202(a) of the Social Security Act generally provides that every individual who is fully insured (as defined in section 214(a), 42 U.S.C. § 414(a)), who has attained age 62 and who files an appropriate application shall be entitled to receive retirement insurance benefits. 42 U.S.C. § 402(a). However, under section 203(b), deductions are made from payments to which an individual is otherwise entitled if he receives "excess earnings" from wages and self-employment income. 42 U.S.C. § 403(b). Excess earnings for a particular year are defined as fifty percent[2] of the individual's earnings in excess of the "applicable exempt amount." 42 U.S.C. § 403(f)(3). For 1978 the applicable exempt amount was $333.33 per month, or $4000 for the entire year. 42 U.S.C. § 403(f)(8)(D)(i). In 1978 earnings by an individual over the age of 72 would not cause a reduction in retirement benefits. 42 U.S.C. § 403(f)(3).[3]

Medicare Part A benefits are provided to individuals who are age 65 or older and who are entitled to receive retirement insurance benefits under the Social Security Act and to disabled persons. See, 42 U.S.C. §§ 1395c et seq. Benefits provided by Part A generally cover the costs of hospital and related post-hospital services. Medicare Part B is a voluntary insurance program to provide supplementary medical insurance benefits for aged and disabled individuals who elect to enroll in the program. See, 42 U.S.C. §§ 1395j et seq. Every individual who is entitled to receive Part A benefits is also eligible to enroll in the Part B insurance program. 42 U.S.C. § 1395o(1). Part B benefits are financed by premium payments from participants and by funds from the federal government.

Plaintiff submitted an application for retirement insurance benefits in March, 1978. Apparently, such application also constituted an application for Medicare benefits. The Social Security Administration ("SSA") determined that, although plaintiff was otherwise entitled to receive retirement benefits, he had earned wages in excess of the permissible amount, thereby requiring that part or all of such benefits be withheld. Plaintiff also claimed that he had applied for Part B insurance in January, 1976 and that he was therefore entitled to be reimbursed for the costs of an eye operation which he underwent in September, 1977. However, SSA concluded that plaintiff had not submitted an application for Part B insurance benefits until March, 1978 and that he was therefore to receive such benefits commencing July, 1978.[4] Therefore, SSA denied plaintiff's claim for retirement insurance benefits for the year 1978 and for reimbursement for the eye surgery both initially and upon reconsideration. At plaintiff's request, a hearing was commenced before an Administrative Law Judge ("the ALJ") May 15, 1979 but was not concluded that day. After a series of

---

2. Because "excess earnings" are one-half of the amount of an individual's earnings which exceed the applicable exempt amount, the individual's benefits are reduced by one dollar for every two dollars of earnings above the exempt amount.

3. Section 302(b) of Public Law No. 95–216, enacted December 20, 1977, amended 42 U.S.C. § 403(f)(3) to provide that earnings by an individual over age 70 would not cause a reduction in the amount of retirement benefits paid to such an individual. However, this amendment applies only to taxable years ending after December 31, 1981. See, Social Security Amendments of 1977. .Pub.L.No.95 216, 91 Stat. 1509, at 1531.

4. An individual who enrolls during the "general enrollment period" (January 1 to March 31 of each year) is entitled to benefits beginning July 1st of the year of enrollment. See, 42 U.S.C. §§ 1395q(a)(2)(E), 1395p(e).

adjournments (apparently due to requests made by plaintiff and his counsel), the hearing was resumed and completed October 23, 1979. Plaintiff was the only witness to testify at the hearings. Although his wife was present at the first hearing, she was not able to testify because of the length of plaintiff's own testimony. She did not appear at the second hearing on the stated grounds that she and plaintiff both believed that the ALJ had unnecessarily harassed plaintiff at the first hearing and that she was unable to testify for health reasons.

The ALJ issued a lengthy written decision January 24, 1980 concluding that plaintiff had not become entitled to Medicare Part B coverage until July, 1978 and that plaintiff did have excess earnings which required that his retirement insurance benefits be totally withheld for the year 1978. SSA's Appeals Council affirmed the ALJ's findings June 20, 1980, thereby rendering the Secretary's decision final. Plaintiff commenced this action pursuant to 42 U.S.C. § 405(g) and 1395ff(c).[5]

Plaintiff was born January 23, 1911 and received 60 credits towards a general liberal arts degree at Saint Bonaventure College prior to entering the Army in February, 1942. He became an officer in March, 1943 and was discharged in December, 1945. While in the Army, he received technical training in the field of radio communications and served as a Radio Officer, a position which involved some maintenance and service of equipment. However, most of plaintiff's responsibilities as a Radio Officer entailed procedural and operational matters. After his discharge, plaintiff went to work for Rudolf Wurlitzer Company in North Tonawanda, N. Y. as a "liaison engineer." In such capacity, he seems to been involved primarily in general administra-

tion and co-ordination of work between the engineering and production departments. After working for Wurlitzer for about three years, plaintiff was employed by Sylvania Television Co. for about ten months. At Sylvania plaintiff's work involved assembling and repairing television chassis. Thereafter, plaintiff worked for about a year manufacturing hi-fidelity loudspeakers. In about 1950 plaintiff opened a radio and television service and repair shop.

Plaintiff continued to operate his radio and television shop until about 1962 or 1963, at which time he established the Warsaw Television Cable Corporation ("Warsaw Cable") along with his wife and one Daniel Tavernier.[6] One share of stock was issued to each of plaintiff, his wife and Tavernier, who were the corporation's sole shareholders. Tavernier became President of the corporation, plaintiff became Vice President and plaintiff's wife became Secretary and Treasurer. No stock certificates were ever issued, nor was the appointment of officers ever formalized in writing.

During the first few years of its existence, Warsaw Cable did not conduct actual operations but was involved in obtaining a franchise from the Village of Warsaw to operate a cable television system and in negotiating an agreement with the Rochester Telephone Company for the use of its equipment and facilities. Incorporation of Warsaw Cable does not appear to have involved any substantial financial investment by plaintiff, his wife or Tavernier. Whatever money the corporation received was either borrowed or was paid out of a checking account maintained jointly by plaintiff and his wife. Most of the funds in such account were provided by plaintiff's wife, inasmuch as she was employed as a teacher. Tavernier did not supply any capital for the

5. 42 U.S.C. § 405(g) generally provides for judicial review of the Secretary's decisions concerning disability and retirement insurance benefits. This provision is incorporated into 42 U.S.C. § 1395ff(c) by express reference.

6. The Certificate of Incorporation was signed by Tavernier, plaintiff and his wife June 13, 1962 and was filed with New York's Department of State July 19, 1962. Exhibit 21. Cer-

tain tax returns filed by Warsaw Cable indicate that it was incorporated in July, 1965. Exhibits 22, 23 and 74 (tax returns for fiscal years ending in 1977, 1978 and 1979). It seems probable that exhibit 21, the Certificate of Incorporation, accurately reflects the date of incorporation and that the corporate tax returns are erroneous.

corporation but did provide labor, such as construction, setting poles and stringing lines. Such services were also performed by plaintiff and (eventually) by part-time employees. Warsaw Cable began operating some time around 1965, when it obtained a franchise from the Village and agreed to lease equipment from the telephone company.

Relations between the Toners and Tavernier soured shortly after the corporation was established. Plaintiff testified that he and Tavernier had disagreed whether to accept the terms of the lease agreement with the telephone company and concerning the need to locate an office in the Village of Warsaw. Tavernier apparently also believed that he should have been paid for installation work performed by him, whereas plaintiff was not paid.

In 1967 plaintiff and his wife moved from their home in East Aurora, N. Y. to Warsaw and established a corporate office in their new house.[7] Plaintiff testified that Tavernier performed an average of only two hours of work each week for Warsaw Cable at this time. Apparently Tavernier ceased performing any services for the corporation shortly thereafter. In 1970 plaintiff became President of Warsaw Cable and Tavernier became Vice President. Plaintiff's wife continued in her capacity as Secretary and Treasurer. Eventually, Warsaw Cable virtually saturated its potential television market.[8]

In 1977 and the early part of 1978, Warsaw Cable underwent a period of transition in anticipation of plaintiff's retirement. This transition entailed plaintiff's withdrawal from field work and the hiring of additional part-time employees to handle administrative matters. Plaintiff testified that in 1976 and 1977 he worked approximately 30–40 hours per week for Warsaw Cable.[9] As of such time, corporate policy was determined by plaintiff and his wife, apparently with no input from Tavernier. Plaintiff testified that he and his wife made general corporate decisions jointly, and that his wife might defer to his judgment about fifty percent of the time. Plaintiff's activities on a day-to-day basis in 1977 appear to have consisted mostly of supervising the part-time office workers and the installation of new hook-ups. Apparently, plaintiff only did field work when one of the corporation's other field workers was unavailable. Plaintiff received a salary of $15,600 from the corporation in 1976 and 1977. During those same years, his wife received no wages, even though she does appear to have performed office work.

Plaintiff indicated at the hearing that, as he hired additional office workers and delegated more field work to other workers, he was able to substantially diminish the amount of time he spent working for Warsaw Cable. He also testified that, upon his retirement, his wife began to perform more functions for the corporation. His March, 1978 application for retirement insurance benefits states that he would "still 'keep an eye' on the business" but that his "wife will do most of the work." Upon plaintiff's retirement, he became Vice President of Warsaw Cable and his wife became President. For the year 1978 the corporation paid plaintiff wages totalling $3600 whereas his wife was paid $16,000. All of plaintiff's wages for 1978 were paid to him in the first three months of the year.

---

**7.** Warsaw Cable pays rent to plaintiff and his wife for use of their house. Its tax returns for the fiscal years ending in 1977, 1978 and 1979 indicate that the corporation paid annual rent of $1020. However, such income was not reported on plaintiff's and his wife's tax returns because, according to plaintiff's testimony, their rental of the house to Warsaw Cable results in a net loss to them.

**8.** Warsaw Cable's reports to the New York State Commission on Cable Television indicate that for the period from July 1, 1976 to June 30, 1978, it had approximately 1100 subscribers, an amount which represented 90% market penetration. *See*, Exhibits 76, 77.

**9.** Plaintiff testified that "there was a time way back" when he worked 40 to 60 hours per week but that as the corporation had become more established he had been able to work only 30 or 40 hours weekly.

After March, 1978, the time of plaintiff's alleged retirement, he still appears to have taken an active role in the corporation. At the time only plaintiff and Tavernier were authorized to sign checks on behalf of the corporation. Thus, because Tavernier was not participating in the business, all of the checks issued by Warsaw Cable in 1978 were signed by plaintiff. Although plaintiff signed the corporation's checks, they were actually prepared by one of its office employees. Plaintiff testified that he examined checks which had been presented for his signature and compared them to the invoice, if any. If an invoice did not accompany the check, plaintiff testified that he might have knowledge about the payment or that he might simply rely on the corporate employee and assume that the check was proper. Because Tavernier would not agree to authorize plaintiff's wife to sign corporate checks (and apparently to relinquish his own authority to do so), a new checking account was established by Warsaw Cable at a different bank in 1979. Thereafter, both plaintiff and his wife executed checks on behalf of the corporation. Plaintiff also testified that he signed the corporation's payroll checks but that these were also prepared by office personnel. He indicated that he sometimes examined the corporation's payroll records but he could not estimate how often he did so.

Plaintiff also continued to perform other services for the corporation. He testified that supplies such as cables, connections and locks were ordered either by him or by an employee. He stated that, depending on the nature of the supplies, the employee might or might not consult with him prior to making the order. He also indicated that technical knowledge was required in connection with ordering some supplies but not others. Warsaw Cable appears to have done only a minimal amount of advertising in 1978, due to the fact that it had already saturated its potential market. Plaintiff continued to sign reports to the Federal Communications Commission and the New York State Commission on Cable Television after the date of his purported retirement. See, Exhibits 64, 77. Plaintiff indicated

that these reports were initially prepared by an office worker and that he made any necessary corrections before signing the reports. Warsaw Cable's tax returns were prepared by its accountant. However, plaintiff testified that he handled the corporation's dealings with its accountant as well as with its attorney. Plaintiff also stated that he was involved in handling the corporation's credit decisions and insurance matters. Plaintiff testified that he estimated the value of all services performed by him for the corporation in 1978 at $3600, the amount of wages which he received for that year. In all, plaintiff stated that he spent an average of two hours each day working for the corporation.

Additionally, in May, 1978 Warsaw Cable purchased the cable equipment which it had been leasing from Rochester Telephone. According to plaintiff's testimony, negotiations leading up to the purchase were conducted for about a year. Plaintiff conducted the negotiations on Warsaw Cable's behalf along with the corporation's accountant and a consultant hired to evaluate the cable system. The purchase agreement was signed on behalf of Warsaw Cable by plaintiff. The purchase was financed (at least in part) by a $10,000 loan made by plaintiff to Warsaw Cable. No payments are made by the corporation on the loan except for interest payments. However, no formal note was executed by the corporation to plaintiff.

Plaintiff testified that, after his retirement, he spent substantially less time working for Warsaw Cable. Moreover, he indicated that, although neither he nor his wife spent a great deal of time working for the corporation, she spent more time than he did. He described his wife's activities as maintaining the house and corporate office, getting meals for the office employees, taking phone calls, handling the corporation's mail and handling credit matters. According to plaintiff, his wife also filled in for the part-time employees if they could not be present. Plaintiff stated that his wife did more work in the second half of 1978 than she had done prior to his retirement,

but also seemed to suggest that the increase in amount of work done by her was not very significant. He attributed the increase in the amount of his wife's work to growth in the corporation. However, reports submitted to the New York State Commission on Cable Television indicate that, from June 30, 1977 to June 30, 1978, the number of Warsaw Cable's subscribers rose only from 1100 to 1126. Exhibits 76, 77.

There are several discrepancies concerning the ownership and management of Warsaw Cable contained in its tax returns. The federal income tax returns for the fiscal years ending June 30, 1977 and June 30, 1978 state that plaintiff owned 67% of the outstanding shares of the corporation. Exhibits 22, 23. The tax return for the fiscal year ending June 30, 1979 states that plaintiff's wife owned 67% of the outstanding shares. Exhibit 74. Nevertheless, it is clear that plaintiff, his wife and Tavernier each owned 33⅓% of the corporation during those tax years. A Corporation Franchise Tax Report filed by Warsaw Cable with the State of New York for the 1976–77 fiscal year lists plaintiff as the sole officer of the corporation, but both plaintiff's wife and Tavernier were also corporate officers. A similar report for the 1977–78 fiscal year lists both plaintiff and his wife as officers but fails to list Tavernier. Plaintiff explained such discrepancies by stating that the corporation's accountant had prepared the returns and that he, plaintiff, had overlooked the errors prior to signing them.

Turning to plaintiff's claim for Medicare Part B benefits, it appears that in October, 1975 plaintiff telephoned SSA and had an application for Medicare benefits completed by an SSA representative on his behalf. Presumably, this application would then have been mailed to plaintiff so that he could sign it and then return it to SSA. Plaintiff testified that, following his telephone conversation with SSA, he did receive something from SSA in the mail but that he could not recall what it was. Exhibit 1 is an unsigned application for retirement insurance benefits (which would also have served as an application for Medicare) dated October 9, 1975 and marked received by SSA March 14, 1978. Thus, it appears that plaintiff received the completed application in the mail from SSA but that he failed to sign and return it to SSA until he applied for retirement insurance benefits in March, 1978.

Plaintiff testified that in January, 1976, shortly after his 65th birthday, he visited SSA's district office in Batavia, N. Y. in order to apply for Medicare. He stated that his wife accompanied him on this visit. According to plaintiff's testimony, he filled out and signed forms which were given to him by an SSA employee who seemed "green at the job." Following his visit, plaintiff thought he had properly applied for Medicare.

In the fall of 1977 plaintiff underwent surgery for cataracts and had an artificial lens implanted in his left eye. The cost of such surgery was $1400. His claim for Medicare based on this surgery was rejected by SSA shortly thereafter. Plaintiff testified that he first learned that he was not covered by Medicare Part B at the time that SSA refused to pay for his eye surgery. In December, 1977 plaintiff returned to SSA's district office in Batavia to inquire why his claim was rejected. He testified that he was told that there were no records of his alleged visit to the district office in January, 1976. Plaintiff objected to the denial of his claim both verbally and in several letters addressed to SSA. In May, 1978 plaintiff underwent cataract surgery in his right eye. He claims to be entitled to reimbursement for both operations. Essentially, he alleges that, if in fact he did not complete an appropriate application for Medicare during his visit to the SSA district office in January, 1976, his failure to do so was attributable to the SSA employee with whom he had spoken. Subsequent to the administrative hearing, the ALJ received in evidence a letter addressed to him from the Manager of SSA's district office in Batavia which described the general procedures utilized by SSA in connection with the receipt of applications for Medicare benefits. Exhibit 71. The letter states that upon receipt

of an application, the requisite information is sent to a central office in Baltimore, Md., that the only record retained by the district office is an "SSA–250 'Development Worksheet' " and that no SSA–250 was found in the Batavia office with respect to plaintiff's purported visit in January, 1976.

At the beginning of the resumed hearing October 23, 1979, plaintiffs's counsel requested the ALJ to disqualify himself on the grounds that he had already decided the case against plaintiff, but the ALJ declined to do so. At various times throughout the hearings, plaintiff and his attorney questioned whether the ALJ would determine the case fairly and objectively.

During the second or continued hearing, plaintiff was an uncooperative and to a certain extent even belligerent witness. For example, in response to questions by the ALJ concerning subscriptions to periodicals which were maintained by Warsaw Cable, plaintiff testified that the corporation subscribed to "Cablevision" and "CATJ" and went on to state that the ALJ should have inquired about such information earlier. Plaintiff objected to the ALJ's questioning as not important and "nitpicking." Record, at 220.

In response to the ALJ's question regarding plaintiff's role in "drawing checks for payment of [the corporation's] payroll," plaintiff stated "I wasn't drawing, I was signing them. * * * There's a difference. You're trying to put words in my mouth." Record, at 223. The ALJ's choice of words may have been unfortunate, but it does not appear that his use of the word "drawing" was intended to imply that plaintiff was involved in actually preparing the payroll checks. Certainly, the ALJ provided plaintiff every opportunity to describe his actual payroll responsibilities. Indeed, when the ALJ inquired how frequently plaintiff examined Warsaw Cable's payroll records, plaintiff was hostile and uncooperative:

"Q. * * * How often did you pick up the payroll books?

"A. Perhaps ever[y] several months.

"Q. Once every two months?

"A. Oh, I think this is ridiculous. I look at them every now and then. Let's let it go at that.

"Q. Well, I never—

"A. I can't give you a specific time or dates that I look at them. I want to make the point clear that I do sometimes look at the payroll records. But I don't check them. I simply sign the checks and that's it.

"Q. Do you check them at least once a month?

"A. No.

"Q. Once every two months?

"A. Not necessarily.

"Q. Generally?

"A. Some of the time." Record, at 225–26.

When the ALJ asked whether Warsaw Cable submitted reports to any administrative agency or agencies, the following exchange occurred:

"A. We filed annual reports with the New York State Television Cable Commission and I think you have copies of them there. It seems to me the question is redundant.

\* \* \* \* \* \*

"ALJ: I do not recall seeing such reports * * *.

"CLAIMANT: Well, if you didn't get them, it's because you didn't ask for them.

"ALJ: I see. Well—

"CLAIMANT: And we discussed this at the previous hearing. You'll find it on tape. * * *

"ALJ: Are you sure that we discussed that?

"CLAIMANT: Yes, I'm positive." Record, at 236–37.

The transcript does not reveal that any discussion concerning the requirement of filing annual reports with the New York State Cable Television Commission was held prior to this exchange.

Additionally, Warsaw Cable's tax return for the fiscal year ending June 30, 1978 states that plaintiff's wife worked for the

corporation on a full-time basis. Exhibit 23. When the ALJ inquired into the meaning of the tax return, plaintiff again became hostile, stating "I would think it [the tax return] was wrong. How would you define full time? What is full time? 40 hours a week? 10 hours a week? What? * * * Is it 100 hours a week? Because full time is 24 hours a day." Record, at 240. Similarly, plaintiff reacted caustically when the ALJ asked whether plaintiff had been making "trouble calls" during the first two calendar quarters of 1978. Record, at 251–52.

Based on the foregoing record, the ALJ determined that after March, 1978, the date of his purported retirement, plaintiff continued to perform significant and substantial services for Warsaw Cable and that plaintiff's wife continued to function primarily in an auxiliary role. The ALJ further determined that plaintiff's wife's earnings from Warsaw Cable did not realistically reflect the value of the services provided by her to the corporation. Therefore, the ALJ allocated $12,000 of plaintiff's wife's salary to claimant's income in order to determine his eligibility for retirement insurance benefits. Based on such re-allocation, the ALJ found that plaintiff was not entitled to receive any such benefits for the calendar year 1978. The ALJ also found that plaintiff had not applied for Medicare benefits until March, 1978 and that his eligibility for Medicare Part B had not commenced until July, 1978. In large part, the ALJ's findings are based upon conclusions regarding the credibility of plaintiff's testimony.

In this action, the Secretary's findings are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, my function is not to make a de novo determination whether ·plaintiff is entitled to retirement insurance benefits for the year 1978 or whether he is entitled to coverage under Medicare Part B prior to July, 1978, but only whether the Secretary's findings are supported by substantial evidence. *Dousewicz v. Harris*, 646 F.2d 771, 773 (2d Cir. 1981); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980). Substantial evidence

"means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971), quoting *Edison Co. v. Labor Board*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Evaluation of a witness's credibility is a matter particularly committed to the ALJ's expertise and judgment. *See, Williamson v. Califano*, 487 F.Supp. 308, 314 (W.D.Mo.1980); *Gardner v. Richardson*, 383 F.Supp. 1, 5 (E.D.Pa.1974).

 I turn first to plaintiff's claim for retirement insurance benefits. It is generally acknowledged that an individual may arrange his financial affairs in such a manner as to render himself eligible to receive retirement insurance benefits, provided that the business transactions are bona fide. *See, e.g., Gardner v. Hall*, 366 F.2d 132 (10th Cir. 1966). Nevertheless, it is equally clear that, where an applicant for retirement insurance benefits continues to render substantial services for his corporate employer even after the time of his alleged retirement and the corporation pays wages to a member of the applicant's family which do not reflect the reasonable value of services provided to the corporation by the family member, the Secretary may treat the salary arrangement as a "sham" or "scheme of shifting wages." *Dondero v. Celebrezze*, 312 F.2d 677 (2d Cir. 1963); *Newman v. Celebrezze*, 310 F.2d 780 (2d Cir. 1962); *Rebak v. Matthews*, 438 F.Supp. 668 (S.D.N.Y. 1977). In such circumstances, the Secretary may determine that the salary arrangement is fictitious and may allocate income earned by the applicant's family member to the applicant in order to determine the latter's entitlement to retirement insurance benefits.

In the present case, there is substantial evidence to support the ALJ's conclusion that, even after the time of plaintiff's alleged retirement in March, 1978, plaintiff continued to provide substantial services for Warsaw Cable. By his own testimony, plaintiff continued to participate in matters such as supervising the corporation's office

employees, signing checks,[10] ordering supplies, examining reports submitted to federal and state regulatory agencies, reviewing the corporation's tax returns, handling the corporation's dealings with its accountant and lawyer, making field trips on an emergency basis and making credit decisions. Plaintiff was also involved in negotiating and signed the agreement by Warsaw Cable to purchase equipment from Rochester Telephone Company. It is also significant that plaintiff has a substantial background in communications which is useful in managing Warsaw Cable. As plaintiff testified, his training in certain aspects has been rendered obsolete by the introduction of transistorized, solid state equipment. Nevertheless, it seems clear that plaintiff (especially in comparison to his wife) has certain technical knowledge which would need to be applied in the management of the corporation.

The ALJ's conclusion that, despite her advancement to the position of corporate President, plaintiff's wife continued to function in an "auxilary" role is also supported by substantial evidence. Plaintiff was able to testify only in very general and vague terms as to the increased responsibilities assumed by his wife. He attributed the increase in his wife's activities to a growth in business. However, prior to plaintiff's retirement, Warsaw Cable had achieved virtually complete market saturation; the number of its subscribers increased by only 26 from June 30, 1977 to June 30, 1978. Thus, it is clear that any increase in the amount of work required by Warsaw Cable in 1978 due to growth in its business was minimal. Additionally, the type of services or work performed by plaintiff's wife after plaintiff's retirement does not appear to have been significantly altered.

Moreover, I find substantial evidence to support the ALJ's conclusion that the corporation's payment of wages of $16,000 to plaintiff's wife and $3600 to plaintiff in 1978 constitutes a mere scheme to shift income. Although, as already noted, there was no significant increase in plaintiff's wife's activities on behalf of Warsaw Cable in 1978, her salary from the corporation rose from $0 to $16,000 in that year. Plaintiff's wife's activities (such as maintaining the house and corporate office, fixing meals for the office employees, answering the phone and filling in for the office employees) were primarily limited to routine matters which were not central to the management of the corporation. In contrast, plaintiff retained control over the most significant corporate affairs, such as preparation of administrative reports and tax returns and handling major transactions by the corporation. Plaintiff's involvement in Warsaw Cable's day-to-day affairs may have diminished in 1978, but his responsibility for its overall management continued beyond the time of his purported retirement. Moreover, it seems clear that plaintiff spent approximately the same amount of time working for Warsaw Cable in 1978 as his wife did. Thus, the ALJ's determination that the salary paid to plaintiff's wife by Warsaw Cable in 1978 did not realistically reflect the value of services provided by her is supported by substantial evidence.[11] Therefore, the ALJ's allocation of three-fourths of the wages paid to plaintiff's wife as income to plaintiff in determining his entitlement to retirement insurance benefits must be upheld.

---

**10.** Plaintiff places much emphasis on the fact that only he and Tavernier were authorized to sign checks on behalf of Warsaw Cable and that Tavernier refused to cooperate in running the corporation. However, plaintiff's difficult relations with Tavernier do not detract from the finding that plaintiff did in fact sign all of the checks issued by Warsaw Cable in 1978. Certainly, Tavernier's refusal to cooperate does not explain plaintiff's personal involvement in other corporate activities.

**11.** *Bryan v. Matthews*, 427 F.Supp. 1263 (D.D.C.1977), requires that in order to support a re-allocation of income from another person (such as plaintiff's wife) to an applicant for retirement insurance benefits, there must be a finding that the other person's salary was excessive or not earned by him. The ALJ's determination that plaintiff's wife's salary "did not realistically reflect the value" of services provided to the corporation by her satisfies this requirement.

To a large extent, the ALJ's decision to re-allocate plaintiff's wife's salary to plaintiff was based on his evaluation of plaintiff's credibility. While I would not have placed as much emphasis on certain aspects of the record as the ALJ did (such as plaintiff's failure to adhere scrupulously to corporate formalities), the record as a whole amply supports the ALJ's determination that plaintiff's testimony was not credible. In many respects, plaintiff's testimony was vague and ambiguous. Such ambiguity was not cured even upon examination of plaintiff by his own attorney. At the second hearing October 23, 1979 plaintiff was openly hostile and belligerent towards the ALJ. Although plaintiff attributes his hostility to what he characterizes as improper examination by the ALJ, the nature and scope of the ALJ's questions were largely a response to plaintiff's own refusal or inability to provide specific testimony. In this regard, it is noteworthy that plaintiff's attorney did little or nothing to assist the ALJ in obtaining cooperation from plaintiff. Further, plaintiff's wife's failure to testify at the second hearing raises serious questions concerning plaintiff's credibility. Certainly, plaintiff's wife could have provided the most accurate testimony relative to her specific activities on behalf of Warsaw Cable. If plaintiff's wife was truly unable to testify due to her health, plaintiff should have obtained a letter from her physician to such effect.

Plaintiff places much emphasis on the fact that Warsaw Cable is a *bona fide* corporation and argues that the Secretary is required to recognize the validity of the corporation's transactions. He relies primarily on *Markarian v. Califano,* 473 F.Supp. 671 (W.D.N.Y.1979), in which this court held that the Secretary could not treat as wages interest and rent paid to the plaintiff by his corporate business in determining plaintiff's eligibility for retirement insurance benefits. The court found that the corporation was genuine and therefore adhered to the general principle "that an individual can arrange his financial matters in a way which will place him within the entitlement provisions of the Social Security Act, so long as the business transactions are bona fide and real." *Markarian v. Califano, supra,* at 674. However, I find that his case is more similar to *Rebak v. Matthews, supra,* than to *Markarian.*

In *Rebak* the Secretary claimed that plaintiff had received an overpayment of retirement insurance benefits because he had received excess wages from a realty corporation of which he was president and sole stockholder. Plaintiff claimed to have retired in 1970 and received wages of $3000 from the corporation in both 1970 and 1971 and $1600 in 1972. Plaintiff's wife was paid $5000 by the corporation in both 1970 and 1971 and $8000 in 1972, but had not received any salary prior thereto. The Secretary had concluded that the plaintiff had received indirect compensation from the corporation in the form of sham wage payments to his wife. The court upheld the Secretary's conclusion, reasoning that plaintiff's wife performed only minimal services for the corporation, that even after his alleged retirement the plaintiff continued to make all major decisions affecting the corporation and that the salary paid to plaintiff's wife in 1970, 1971 and 1972 "did not reflect an actual increase in her authority or the extent of her services to the corporation." *Rebak v. Matthews, supra,* at 673.

The facts presented in this case are strikingly similar to those in *Rebak.* *Markarian,* on the other hand, involved certain rental and interest payments to the claimant which were determined to reflect bona fide business transactions between the claimant and his corporation. Because there is substantial evidence to support the Secretary's conclusion that Warsaw Cable's salary payments to plaintiff's wife were a mere sham rather than a genuine reflection of the value of services provided by her, *Rebak* rather than *Markarian* is applicable in this case.

■ The Secretary's findings with respect to plaintiff's claim for Medicare Part B benefits are also supported by substantial evidence. The ALJ rejected plaintiff's contention that he had contacted SSA's district office in Batavia in January, 1976 and ap-

plied for Medicare Part B benefits at that time. The ALJ noted that plaintiff's wife was receiving Part B coverage. Thus, the ALJ reasoned that plaintiff should have been aware that he was required to pay premiums in order to receive Part B coverage and that he should have been issued a card indicating that he was enrolled in Part B. Because plaintiff was not billed and did not receive an insurance card for Part B coverage, the ALJ found that plaintiff's claim that he had presumed that he was enrolled in Part B after January, 1976 was not credible. The ALJ's reasoning in this regard is persuasive. Moreover, for the reasons discussed with respect to plaintiff's claim for retirement insurance benefits, the ALJ was justified in discounting the veracity of plaintiff's testimony.

Relying on *Dorman v. Harris*, 633 F.2d 1035 (2d Cir. 1980), plaintiff argues that the ALJ committed error by relying on the memorandum from the Batavia district office which was received after the conclusion of the second hearing. Based upon the memorandum, the ALJ concluded that the Batavia district office's records failed to support plaintiff's claim that he had visited the office in January, 1976. It does *not* appear that plaintiff seriously claims that SSA's records *do* reflect that he visited the office in Batavia in January, 1976. Rather, as he argues in his memorandum of law in opposition to the Secretary's motion for summary judgment, he argues that SSA failed to properly process his application, apparently due to the alleged inexperience of the SSA employee with whom plaintiff claims to have spoken. However, as I have already pointed out, the ALJ was entirely justified in rejecting plaintiff's testimony concerning his alleged visit to the Batavia district office in January, 1976.

The ALJ's reliance on Exhibit 71 is entirely different from the situation presented in *Dorman v. Harris, supra*, where the Secretary had relied on a check which purportedly bore that plaintiff's signature and which was received in evidence after the conclusion of the administrative hearing. Because such plaintiff had denied receiving the check, this evidence severely under-

mined his credibility. On review by the Appeals Council and by the courts, he contended that he had not signed the check and that his "signature" was a forgery. The court held that because the ALJ's examination of the check had deprived Dorman of any opportunity to contest the validity of his signature, the ALJ's reliance on the check was improper. However, in the present case, there is no serious question that SSA records do not support plaintiff's claim that in January, 1976 he visited the Batavia district office. Moreover, at the conclusion of the second hearing, the ALJ indicated that he was "in the process of also gathering together some information" and that he would "make it available to [plaintiff] for [his] comment." Plaintiff does not contend that he was not permitted an opportunity to respond to or comment upon Exhibit 71.

■ Finally, plaintiff argues that he was denied a fair hearing because the ALJ was hostile and biased against him. He claims that the ALJ's questioning was "excessive" and "adversarial." Specifically, he points to the ALJ's questions concerning ownership of the corporation, plaintiff's and his wife's respective roles in making corporate decisions and the preparation of checks issued by the corporation. The ALJ's questions concerning ownership of Warsaw Cable were directed at attempting to resolve conflicting evidence as to the amount of shares in the corporation which were owned by plaintiff and his wife. Examination by the ALJ regarding the method by which corporate decisions were made was merely intended to elicit fairly specific testimony from plaintiff. Record, at 165–66. The ALJ's questions in this regard can hardly be characterized as "excessive" or "adversarial." I am also unpersuaded that the ALJ's examination of plaintiff with respect to the issuance of corporate checks was improper. The corporation's manner of making payments, and particularly plaintiff's role in connection therewith, was an important issue which required extensive development. Its importance was further heightened by the dispute between the Toners and Taver-

nier concerning management of Warsaw Cable.

Based on my review of the record, I cannot conclude that plaintiff was denied a fair hearing. At all times, plaintiff was represented by an attorney. The nature of the ALJ's examination of plaintiff was largely a response to plaintiff's own refusal to cooperate. Indeed, my reading of the record suggests that plaintiff's hostility at the second hearing may have been calculated to provoke the ALJ into committing some reversible error. However, the ALJ conducted the hearing in a fair manner and permitted plaintiff every opportunity to present whatever evidence or testimony he desired.

Therefore, the Secretary's motion for summary judgment is hereby ORDERED granted.